# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

JOSE JOAQUIN SANTANA, JR.,    )
       PLAINTIFF         )
                    )
vs.                    )       CAUSE NO. 1:19-cv241 HSO-JCG
                    )
AARON'S INC.,          )
       DEFENDANT     )

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

The Plaintiff, JOSE JOAQUIN SANTANA, JR. ("Santana"), by and through counsel, files this his Memorandum in Opposition to Defendant's Motion for Summary Judgment and supporting memorandum [*Docket No. 98 and 99*].  In support of the same, Plaintiff submits the following:

### FACTUAL AND PROCEDURAL BACKGROUND

### I.    DEFENDANT'S OPERATIONS

In its Motion, Defendant holds itself out to simply be a retailer of residential furniture, consumer electronics, home appliances, and accessories, operating a chain of stores nationwide.  However, Defendant's typical practices differentiate it from the common retail store.  Defendant labels itself the leader in "lease-to-own furniture, appliances, and electronics" where consumers enter into a leasing program and make monthly payments in exchange for the goods sold[1].  In financing the majority of the items sold, Defendant's role shifts from retailer to creditor after almost every purchase.

In a lease-to-own transaction, customers rent an item – typically a major household appliance or piece of furniture – for a monthly cost that's usually much lower than a monthly loan payment would

---

[1] https://www.aarons.com/about-us.html

be. The rate is attractive because it seems more affordable than an up-front purchase or typical payment plan. After completing payment in full over the term of the rental, the customer owns the item. But that rental period is a much longer one, and after calculating the total expense, the buyer ends up paying far more than a conventional loan would have demanded. Typical rent-to-own customers have poor or nonexistent credit and cannot rely on traditional means of financing to make large purchases. This lease-to-own model requires employees of stores, such as the Defendant's, to ultimately become debt collectors and, potentially, repossess goods that have fallen into non-payment. This substantially changes the dynamic you typically see between customer and salespeople in the traditional retail environment.

## II.    PLAINTIFF'S EXTENSIVE EMPLOYMENT HISTORY

Plaintiff has a history with Defendant far beyond what is outlined in Defendant's Motion. Plaintiff has worked for Defendant over the span of an almost thirteen year period – during which he provided quality work and was an asset to the company.  Unfortunately, this history is also riddled with discriminatory practices and unprofessional conduct on the part of the Defendant.

### a.    *Initial Employment:  November 2005-May 2012*

In November 2005, Defendant first began working with Defendant (then Homestart).  See **Exhibit A**.  He was hired as a manager trainee on October 6, 2005 at a store in Cayce, South Carolina. In November 2005, Plaintiff executed a Driver Exemption Form. Said form is attached hereto as **Exhibit B**.  In 2010, Plaintiff was diagnosed a second time with a brain tumor[2].  As a result, Plaintiff relocated to Columbia, South Carolina to be closer to medical care, but retained his employment with Defendant as General Manager.

In 2012, Plaintiff was forced to take Family Medical Leave Act ("FMLA") leave to undergo and recover from a second brain surgery.  In 2013, without warning, Plaintiff was terminated by his

---

[2] Plaintiff's original diagnosis occurred in May 2004.

then-Regional Manager, Paula Hilley - despite excellent store performance and profitability of the store he was managing. However, Plaintiff was focused on his health and his deteriorating vision, so while he questioned the reasoning and whether it was because of his worsening disability, he did not pursue further explanation.

b. *Reinstatement: June 2012-June 2015*

In less than thirty days, on June 11, 2012, Plaintiff was asked to return to work for Defendant as General Manager in South Carolina and was subsequently reinstated. See attached **Exhibit C**. He remained in this position with no issue or disciplinary action until June 2015. At that time, he was told by his manager, Dooley Pellerin, that he was being terminated and specifically noted that Plaintiff had "to be able to drive" to hold this position. This statement came with no warning and years after he executed his Driver Exemption Form. However, this was foreshadowed by one of his Regional Managers, Sam Rhinehart, prior to his departure from the South Carolina region. Attached hereto is the affidavit of Sam Rhinehart as **Exhibit D**. See also (See **Exhibit Z;** Santana June 28, 2021 Dep. 27:5-12)

c. *Reinstatement: August 2015-September 2018*

In August of 2015, Plaintiff's former Regional Manager, Sam Rhinehart, needed a reliable, trustworthy employee in his new region on the Mississippi Gulf Coast. See **Exhibit D**. So, he reached out to Plaintiff who was immediately reinstated and paid by the Defendant to relocate to D'Iberville, Mississippi. See **Exhibit E and F.** Plaintiff executed another Driver Disqualification Form on September 18, 2015. See **Exhibit G.** Plaintiff was initially utilized as a 'floater' to assist at various stores across the state of Mississippi before he was finally given the position of General Manager at the D'iberville store.

In October 2016, Plaintiff underwent a routine examination by his physician, Dr. Debra LaPrad, who noted that he should not be issued a driver's license given the severe deterioration of his

eyesight.  In December of 2016, Plaintiff voluntarily surrendered his driver's license as acknowledged by the Mississippi Department of Public Safety in **Exhibit H.**  This information was shared with Plaintiff's then-Regional Manager, Brent Duncan and then-Senior Regional Manager, Sam Rhinehart.

In March of 2017, Jamie Lively became Regional Manager and Plaintiff's supervisor.  Upon his departure, Sam Rhinehart shared concerns, again, that he felt management was taking issue with Plaintiff's inability to drive due to his disability. See **Exhibit D**.  Plaintiff heeded this warning and attempted to have a working relationship with Lively; however, it became clear that Rhinehart's warnings would prove accurate. Plaintiff noted that when Lively discovered the extent of his disability he would begin his crusade against him.  (See **Exhibit Z;** Santana June 28, 2021 Dep. 27:5-12) Ultimately, this 'issue' escalated when Plaintiff was informed by Lively that he would be requiring Plaintiff to drive in November 2017.  Plaintiff was not aware if Lively was made aware that he had been disqualified to drive since his reinstatement in 2015 and since he relinquished his license in 2016[3]. ((See **Exhibit Z;** Santana June 28, 2021 Dep. 54-55)  Further, Plaintiff noticed that he was treated differently than the other General Managers supervised by Lively.  (See **Exhibit Z;** Santana June 28, 2021 Dep. 28-31)

  i. <u>The January 24th CAF ("CAF-1")</u>

On January 24, 2018, Plaintiff received the first Corrective Action Form ("CAF-1") from Supervisor Jamie Lively and said document is attached hereto as **Exhibit I**.  Other than one previous CAF that was issued by his then-supervisor Brent Duncan[4], this was the first Corrective Action Form ("CAF") the Plaintiff had received during his employment.  This CAF mentioned three (3) different incidents, which span over a time period of five (5) months, all of which Lively claimed that Plaintiff had not completed his "end of day checklist".  Plaintiff has testified that he did not know what

---

[3] Admittedly, Lively noted that there was no discussion with previous supervisors as he transitioned into the role of Regional Manager.  ((See **Exhibit Y;** Lively Dep. 14)

[4] This CAF is attached hereto as **Exhibit J**.  This CAF was issued due to a failed privacy and security audit.

checklist Lively was referring to nor did he have a copy. (See **Exhibit Z;** Santana June 28, 2021 Dep. 72:4-11). Defendant has yet to provide a copy of this elusive checklist in discovery.

In support of this CAF-1, Defendant provides a copy of a Regional Managers Compliance Checklist, completed on December 21, 2017, and is attached as **Exhibit K.** According to Lively, this document is to be completed every (6) months by the Regional Manager. (See **Exhibit Y;** Lively Dep. 32) Interestingly, the December 21, 2017 report was the only document of its kind produced by the Defendant. It is clear that there should have been more produced that would have be completed during Plaintiff's tenure as General Manager, including a subsequent one completed by Jamie Lively in or around June 2018. (See **Exhibit Y**; Lively Dep. 32-33)

ii.  <u>The March 14th CAF ("CAF-2")</u>

On March 14, 2018, Plaintiff received CAF-2 which consisted of two different allegations with regard to Jose's job performance. CAF-2 is attached as **Exhibit L**. First, Lively provided narrative regarding an email he received on March 13, 2028 from Steve Smith, a General Manager at another Aaron's location. In support of CAF-2, Defendant produced an email which was sent to Jamie Lively, seemingly at this request, almost a month after the incident occurred. The email is attached hereto as **Exhibit M.**

However, Defendant's failed to produce an email from the day of the incident between the Plaintiff and the General Manager which provided further explanation about what happened as this was a miscommunication between colleagues. See **Exhibit N**. Plaintiff and another General Manager had a miscommunication and a couple of heated conversations – both later apologized. However, Lively did not want to hear the explanation for the incident and did not wish to review the email sent by the other General Manager. (See **Exhibit Z;** Santana June 28, 2021 Dep. 87:3-8)

Additionally, Lively attempts to again allege that Plaintiff did not complete his end-of-day checklist on March 5, 2018 and March 13, 2018, claiming that the trucks were left in a state of disarray

on both days and "pictures are attached".[5]  First, no pictures were produced to support CAF-2.

Secondly, Lively's allegations included a day that Plaintiff <u>was not even at work</u> on March 13th as noted

at the bottom of CAF-2.  Lively arrived on March 14th before Plaintiff and had not had a chance to

perform checks on the trucks from his day off.  (See **Exhibit Z;** Santana June 28, 2021 Dep. 86:6-23)

   iii. <u>The May 18th CAF ("CAF-3")</u>

CAF-3 was issued on May 18, 2018 by Jamie Lively and presented a series of customer

complaints that allegedly occurred between April 16 and May 7, 2018. See **Exhibit O**. However,

Lively's handling of the first incident listed (April 16th) puts into question the validity of the whole

document.

An incident occurred with a customer on April 16, 2018 which apparently led to a customer

complaint as reported by Lively on April 16[th6]. See **Exhibit P**.  The next day, Lively requested that

one of the associates present, Kaila Smith, provide a statement of what occurred. Smith provided this

statement on April 17, 2018 at 11:55AM. See **Exhibit Q.** However, this statement did not satisfy

Lively's narrative, so he demanded that Smith amend her statement to better reflect his narrative. See

**Exhibit R**.  Smith amended her statement; however, this was not her observation.  Attached hereto

as **Exhibit S** is the affidavit of Kaila Smith.

She later reported to Danielle Riecke that she felt uncomfortable amending her statement and

that she felt Lively had an issue with Plaintiff.  Further, this was the only incident she was ever asked

about despite being present for others alleged the CAF.  See **Exhibit S.**

On April 19, 2018, Plaintiff filed an internal complaint through the employee hotline, noting

discrimination as the primary issue, against his supervisor, Jamie Lively.  Attached hereto as **Exhibit**

---

[5] It is worth noting to the Court that Lively indicated on the CAF that he expected Plaintiff to 'visually verify' the state of the trucks at the end of the workday while aware that Plaintiff has a visual disability and did not drive these vehicles.
[6] Curiously, while the Customer Opportunity Details Number is listed in the email, the full report was not provided by Defendants as with other complaints.

**T** is the EthicsPoint Incident Management report with emphasis added.  The complaint noted that he believed this behavior had been ongoing for three months to a year.  Plaintiff detailed the most recent incident and noted that he believed these actions were as a result of Lively's issue with his disability.  At all times, Plaintiff rooted his concerns in the possibility that these things were occurring due to his disability.

Further, at the time this complaint was made, not only had Lively started issuing CAFs (which, historically, is absent from Plaintiff's employment) but he had also asked another employee to amend a statement to conform to his narrative in an effort to build a case to termination against Plaintiff.  It was clear at this point that Lively was attempting to construct this narrative to get Plaintiff terminated.  **See Exhibit R.** The notes in the complaint investigation even noted that "GM Jose's performance is meeting expectations in the majority of the categories" and none of the disciplinary actions were due to "metrics in the store".  It is obvious that all of the negative impact was stemming from Lively's CAFs.  See **Exhibit T** at page 4, emphasis added.

On April 29, 2018, Plaintiff forwarded a statement in support of his internal complaint to Danielle Riecke following an April 28th phone call with her.  See **Exhibit U**. Again, Plaintiff noted that, since there was not an issue with his job performance with regard to store metrics, he believed that the issuing of the CAFs was based on his disability.  Plaintiff believes this is supported given his ability to refute the CAFs thus far as well as the testimony of Kaila Smith regarding the construction of her statement.  It should be noted that at this point CAF-3 had not been issued.

On April 30, 2018, Lively forwarded a complaint which had had come through the customer complaint program. See **Exhibit V**.  This complaint seemingly was opened on April 30th; however, there are no details as to the complaint in the report or in the email sent from Lively.  Defendant is comfortable resting on the assumption that this is one of the incidents outlined in CAF-3 even though there is nothing in the documentation to support that theory.

On May 4, 2018, a complaint was opened through the customer complaint program which detailed an incident that occurred on May 2, 2018. The customer claimed that Plaintiff stated that he was not a mechanic when asked about repairs and stated the "store has a bad attitude". See **Exhibit W**.

On May 7, 2018, CAF-3 notes that a customer called "C1487" with a complaint about an online merchandise order. Plaintiff was General Manager for the D'Iberville store which is identified in all documents as C0724, *including this particular CAF*. Given that no other documentation supports this alleged incident, it is Plaintiff's position that this was included in the CAF in error and as a reason for Lively to finally issue CAF-3 – a document that he'd been assembling since April 16, 2018. On May 8, 2018, CAF-3 was finally issued. The internal investigation against Lively was still ongoing at this point.

### iv.   The September 18th CAF ("CAF-4")

On September 18, 2018, CAF-4 was issued which resulted in final termination and is attached hereto as **Exhibit X**. The CAF notes an incident that occurred on September 13, 2018; however, Defendant has provided no customer complaint, supporting emails, statements, or other documentation which support that this complaint even occurred. CAF-4 also cites to the three previous CAFs which were issued over the course of the previous eight (8) months.

Plaintiff recalled that a customer came into the store, requesting furniture; however, she had not filled out the necessary forms. Unfortunately, while Plaintiff was explaining this to the customer, she became agitated to the point that her husband and son were trying to get her to leave the store. The incident escalated and the police were called to the store. This incident was witnessed by Kaila Smith; however, she was not questioned about this incident. See **Exhibit S**. Even more notable is that there isn't anything in the documentation provided by Defendant which noted that Plaintiff was so concerned for the safety of the store that authorities were called.

Plaintiff was ultimately terminated on September 18, 2018; however, the internal complaint/investigation was not concluded regarding Plaintiff's complaint against Jamie Lively until September 28, 2018. See **Exhibit T**.

## ARGUMENT & RELEVANT AUTHORITY

## I.   PLAINTIFF'S CLAIM FOR DISCRIMINATION PURSUANT TO THE ADA SHOULD SURVIVE SUMMARY JUDGMENT

The Americans with Disabilities Act ("ADA") prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability" by, among other things, terminating the individual's employment. 42 U.S.C. § 12112(a). In a discriminatory-termination action under the ADA, an employee may either present direct evidence that they were discriminated against because of their disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff in this case concedes that he is offering circumstantial evidence with regard to the allegations set forth in this matter.

When utilizing the *McDonnel Douglas* framework, the Plaintiff must make a *prima facie* showing of discrimination. Once this is done, a presumption of discrimination arises, and "'the employer must 'articulate a legitimate non-discriminatory reason for the adverse employment action[. . .] The burden then shifts to the plaintiff to show the articulated reason is pretextual." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 227 (5th Cir. 2015). Simply put, "[. . .] a prima facie case of discrimination plus a showing that the proffered reason is pretextual is typically enough to survive summary judgment." *E.E.O.C. v. LHC Grp., Inc.,* 773 F.3d 688, 694 (5th Cir. 2014).

Plaintiff submits that he, through the culmination of the circumstantial evidence that he has presented in this case, he can satisfy the three-prong requirements laid out in the *McDonell Douglas* framework to shift the burden back to the Defendant. While Plaintiff believes that Defendant's proffered reasons are lacking in legitimacy, there is significant proof that the reasons are pretextual.

Alternatively, if pretext does not carry Plaintiff's argument, Plaintiff submits that there is at least a mixture of motives behind Defendant's actions.

      a.   <u>Plaintiff's *Prima Facie* Case for Discrimination</u>

In order to prove a *prima facie* case for discrimination, Plaintiff must show that (1) he is disabled or regarded as disabled within the meaning of the ADA, (2) he is qualified for the job position, and (3) he was subjected to an adverse employment action on account of his disability or perceived disability. *Hebert v. Ascension Par. Sch. Bd.*, 396 F. Supp. 3d 686, 693 (M.D. La. 2019)

*i.  Plaintiff Has a Disability as Contemplated by the ADA*

It is well settled that the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual."42 U.S.C. § 12102(1). To determine whether one has a disability, there is a three-part test for assessment which includes: (1) impairment, (2) major life activity, and (3) whether the impairment substantially limits at least one major life activity. See *Waldrip v. Gen. Elec. Co.,* 325 F.3d 652 (5th Cir. 2003).

Plaintiff is legally blind and has suffered from deteriorating vision impairment since his initial battle with a brain tumor in 2004. As noted in documentation to the Social Security Administration, he recognized that he "cannot see enough to drive." See **Exhibit AA**. This is an activity that Defendant was well aware were issues for Plaintiff during his employment given his execution of multiple Driver Exemption Forms and the voluntary surrender of his driver's license. Plaintiff also noted increasing difficult reading, walking in unfamiliar areas, and other day-to-day activities. See **Exhibit AA**.

The ADA defines neither "substantial limits" nor "major life activities," but the regulations promulgated by the EEOC under the ADA provide significant guidance. *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995). Using these regulations, "[m]ajor life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning,

and working." 29 C.F.R.§ 1630.2(i)  To determine if an impairment substantially limits a major life activity, one has to assess the severity, duration, and long-term impact of the impairment.  *Id.* Plaintiff's eyesight has been deteriorating over a long span of time with no improvement.   No improvement is expected.  It is clear that Plaintiff satisfies this prong of establishing his *prima facie* case.

## ii.   *Plaintiff Was Qualified for his Position*

A "qualified individual with a disability" is defined by the ADA as someone who has a disability, but who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). See also *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 483 (5th Cir. 2001).  It is understood that "consideration shall be given to the employer's judgment as to what functions of a job are essential" and this shall be evidence as to what constitutes essential functions and duties. *Hebert*, 396 F. Supp. 3d at 699 (M.D. La. 2019).

Simply put, Plaintiff *was* performing the essential function of his job, with an accommodation for driving, when he was wrongfully terminated and had done so for quite some time.  Throughout his employment history with Defendant, Plaintiff was terminated multiple times when a new supervisor came on board and took issue with his growing inability to drive only for Plaintiff to be reinstated again and again.  However, when his last supervisor, Jamie Lively, took the reins – he was going to make sure Plaintiff was terminated and that it would be permanent.  Unfortunately, he succeeded.  However, while driving is listed in the job description provided by Defendant, it was very rare that a General Manager *had* to drive and Plaintiff rarely did so before it became impossible.  (See **Exhibit Z;** Santana June 28, 2021 Dep. 56)

In its Motion, Defendant alleged that Plaintiff's application for benefits are inconsistent with the Plaintiff's status as a "qualified individual".  This is completely incorrect. "Pursuit, and receipt, of SSDI benefits does not automatically estop a recipient from pursuing an ADA claim or erect a strong

presumption against the recipient's ADA success." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S. Ct. 1597, 1598, 143 L. Ed. 2d 966 (1999).

It has been well settled that a SSDI claim and an ADA claim can comfortably exist side by side. *Id.* The only caveat is that courts have established that an "an ADA plaintiff cannot ignore [his] SSDI contention that [his] was too disabled to work, but must explain why that contention is consistent with [his] ADA claim that [he] can perform the essential functions of [his] job, at least with reasonable accommodation." *Id* [alternation added]. Essentially, there is nothing preventing these claims from existing simultaneously; however, an ADA Plaintiff should be prepared to explain inconsistencies to the Court. "A plaintiff's explanation of the apparent inconsistency must be 'sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of [his] job, with or without reasonable accommodation.' " *Equal Emp. Opportunity Comm'n v. Vicksburg Healthcare, L.L.C.,* 663 F. App'x 331, 333 (5th Cir. 2016)[alteration added].

Plaintiff was employed by Defendant for 13 years – the better part of his working life. The history was turbulent and not always great, but it was familiar and workable for his worsening disability. For the most part, Defendant accommodated his inability to drive and his store performance was good. That was, until the last eight (8) months of his employment when he was hit with disciplinary that is unprecedented in his time with Defendant and a supervisor who took issue with Plaintiff's limitations. As of September 18, 2018, Defendant lost the only stream of income that his family had and he had some pretty big obstacles to overcome when faced with potential new employers. Defendant had to find a stream of income for his family while he assessed the possibility of finding new employment. For further explanation of his decision, Plaintiff would submit his affidavit, attached hereto **Exhibit BB**.

### iii. *Plaintiff Suffered an Adverse Employment Action*

Finally, Plaintiff must show that he was subjected to an adverse employment action which includes "only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 824 (5th Cir. 2019). However, pursuant to the ADA, "discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision making process and have a determinative influence on the outcome." *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008).

It is clear that Plaintiff suffered an adverse employment action in the form of ultimate termination. Defendant would point to CAF-4 as the only document which resulted in an adverse employment action; however, that is very short-sided given the Defendant's own discipline policy as well as the motives of Jamie Lively.

As provided herein, Plaintiff provided information which he believes cast a shadow of doubt over Lively's motive for the barrage of CAFs during Plaintiff's last months. Plaintiff submits that the sudden campaign of warnings was Lively's intention to use the Defendant's tiered disciplinary structure. The three previous CAFs were noted as supporting information in CAF-4 which would indicate that the adverse employment action started which this disciplinary process was initiated in January 24, 2018. Plaintiff understood that the typical progression for employee discipline to be verbal warning, written warning, final written warning, and termination. (See **Exhibit Z;** Santana June 28, 2021 Dep. 66:10-15) Moreover, Defendant, itself, claims in its Motion that CAF-2, CAF-3, and CAF-4 is the root of their alleged legitimate, non-discriminatory reasons for termination. (*See Def. Brief in Support of Its Motion for Summary Judgment, Docket No. 99, pages 18-19*) Considering the questions surrounding the validity and motivation of Plaintiff's CAFs as well as the Defendant's disciplinary policy, the adverse action seemingly progresses over a period of time.

b.  <u>Defendant's Proffered Reasons for Termination are Questionable at Best</u>

Plaintiff believes that he has made an adequate showing for a *prima facie* case for discrimination. Therefore, the analysis must turn to the Defendant's proffered reason for termination.  As stated above, Defendant points to CAF-2, CAF-3, and CAF-4 as providing the premise for its adverse action. However, Plaintiff has provided explanation which should pose a question of fact with regard to the motives behind these documents.  Plaintiff recognizes that "terminating an employee whose performance is unsatisfactory according to management's business judgment is legitimate and nondiscriminatory as a matter of law. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 701–02 (5th Cir. 2014). However, the reasons proffered by the Defendant may, on its face, seem to be about job performance, but these CAFs were part of a campaign to eliminate Plaintiff from his job due to his disability.

With regard to CAF-2, Plaintiff noted that the reasons provided in this document were misconstrued over a month later by Lively to paint the Plaintiff in a negative light.  Moreover, the secondary allegation in this CAF was made against Plaintiff on a day that he was not even at work.

With regard to CAF-3, the fact that Kaila Smith is provided sworn testimony that Lively demanded to change her statement during his 'investigation' of a customer complaint should call his methods of investigation as a whole into question.  (See **Exhibit S**) Further, this CAF was issued on May 18, 18 2018 after Plaintiff filed an internal complaint against Lively for his discriminatory practices.

Finally, with regard to CAF-4, it is noted on the document that this final termination warning is coming on the heels of the previous CAFs issued by Jamie Lively – all of which have been called into question by his actions.  Defendant is hanging its hat on a string of documents that, at the very least, are subject to fact questions as the trustworthiness of these documents are at issue.

c. <u>Defendant's Proffered Reasons are Pretextual or, Alternatively, Are Rooted in Mixed Motives</u>

While Plaintiff does not believe that Defendant's proffered reasons are trustworthy, Plaintiff does submit to this Court that the Defendant's reasons are pretextual.  It has been determined in the Fifth Circuit that, if an employer's reasoning is considered legitimate and nondiscriminatory, Plaintiff should then "offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Hebert v. Ascension Par. Sch. Bd.,* 396 F. Supp. 3d 686, 706 (M.D. La. 2019).  For the Court's consideration, the Plaintiff applies the facts in this case to both methods.

i. *Pretext Alternative*

Pretext is established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.' " See *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)).  An employee seeking to show pretext must rebut each discrete reason proffered by the employer. *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015).  Plaintiff may meet this burden by showing "evidence of disparate treatment or by showing that the employer's explanation is false or unworthy of credence." *Equal Emp. Opportunity Comm'n v. Steel Painters LLC,* 433 F. Supp. 3d 989, 1005 (E.D. Tex. 2020)

Plaintiff has rebutted each of the CAFs upon which Defendant rests its decision herein.  Each CAF issued by Jamie Lively is rooted in questionable motive that the Plaintiff has offered supporting documents, sworn testimony, and other evidence to rebut.  Plaintiff believes that the evidence provided in this memorandum is sufficient to show that much of Defendant's proffered reason (which rests upon the assertions in the named CAFs) is unworthy of credence.  When a Plaintiff has provided

sufficient evidence demonstrating that the employer's explanation is unworthy, taken together with Plaintiff's *prima facie* case, it is "likely to support an inference of discrimination even without further evidence of defendant's true motive." *Id* (citing *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 365 n.10 (5th Cir. 2013). Plaintiff believes that, with the evidence and testimony provided in this supporting memorandum, he has shown pretext with Defendant's proffered reasons.

### ii. Mixed Motives Alternative

However, if the Court does not find that Plaintiff has established pretext, the Fifth Circuit has provided that the inquiry does not stop there. It has been determined that "discrimination need not be the sole reason for the adverse employment decision ... [so long as it] actually play[s] a role in the employer's decision making process and ha[s] a determinative influence on the outcome" See both *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir.2008) and *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 702 (5th Cir. 2014). An employee alleging discrimination "can still survive summary judgment by showing that an employment decision was "based on a mixture of legitimate and illegitimate motives ... [and that] the illegitimate motive was a motivating factor in the decision." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d at 702. If the Plaintiff is successful in showing that an illegitimate reason was the motivating factor, the burden shifts back to the employer to "show that it would have taken the same action in the absence of the impermissible motivating factor." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309–10 (5th Cir. 2004).

At minimum, Plaintiff has provided that the issuance of the CAFs may have stemmed from actual occurrences, but he was held to a different standard than is expected. Moreover, Plaintiff has succeeded in raising a question as to whether Lively appropriately investigated and handled these complaints and job performance concerns due to his issue with Plaintiff's disability.

For example, with regard to CAF-2, the issue Plaintiff had with another General Manager was noted almost a month after the incident occurred.  See **Exhibit L**. Plaintiff attempted to show Lively the email and explain that the misunderstanding had been clarified right after it occurred; however, he didn't want to hear it.  (See **Exhibit Z;** Santana June 28, 2021 Dep. 87:3-8)  To add insult to injury, the second allegation in CAF-2 was made against Plaintiff when he wasn't even present at the store.

When considering the motive behind CAF-3, there is no question that there were customer complaints.  See **Exhibit** O. Plaintiff worked in a rent-to-own store where sales is only half the job – you also act as debt collector and, sometimes, have to repossess items which go unpaid.  Customers *will* complain.  So, when they do, it's up to Lively to investigate these complaints above and beyond what the customers state happened.  He seemingly did that for one of the incidents listed in CAF-3; however, it became clear that Lively was constructing a narrative, focused on building a case against Plaintiff.  His methods even confused and made other employees uncomfortable.  See **Exhibit S**. After his demands to get the narrative he wanted went unsuccessful, it's clear that his investigatory methods became singularly focused.  He did not speak to sales associates who were involved in these incidents nor did he speak with the Plaintiff.

Finally, CAF-4 brought down the final blow. However, this document was predicated by a series of problematic CAFs issued by a supervisor with illegitimate motives – or at least questionable motives, at best. After years of employment, Plaintiff was faced with a barrage of disciplinary action by a supervisor that took issue with a disability that Plaintiff had been working with for quite some time. Defendant's motives are a question of fact and should satisfy the mixed motives alternative to bring their proffered reasons to an inquiry.

## II.   PLAINTIFF'S CLAIM FOR RETALIATION SHOULD SURVIVE SUMMARY JUDGMENT

As with Plaintiff's claim for discrimination, the Fifth Circuit applies the *McDonnell Douglas* framework where the claim is based on circumstantial evidence.  Similarly, Plaintiff concedes that he

is presenting circumstantial evidence in support of his claim for retaliation. In this circumstance, the Plaintiff has the burden to prove a prima facie case of retaliation by showing (1) she engaged in a protected activity; (2) she "suffered an adverse employment action"; and (3) "a causal connection exists between the protected activity and the adverse employment action. *Brown v. Wal-Mart Stores E., L.P.,* 969 F.3d 571, 577 (5th Cir. 2020. Moreover, retaliation claims must carry a 'but-for' causation stage, but not at the *prima facie* stage. *Garcia v. Prof'l Cont. Servs., Inc.*, 938 F.3d 236, 242 (5th Cir. 2019). At this stage, Plaintiff can meet his burden of causation by showing "close enough timing between his protected activity and his adverse employment action". *Brown*, 969 F.3d at 577 (5th Cir. 2020).

As with the discrimination claim, if the Plaintiff can carry his *prima facie* case across the finish line, the burden shifts to the Defendant to product a "legitimate, non-discriminatory reason" for the adverse employment action. *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). If this is accomplished, the Plaintiff is required to show that the proffered reason is pretextual. *Id.* Ultimately, in order to survive a motion for summary judgment, Plaintiff must show "a 'conflict in substantial evidence' " on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012)). Evidence is considered "substantial" if it is such "quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.*

    a.   <u>Plaintiff's *Prima Facie* Case for Retaliation</u>

        i.   *Plaintiff Was Engaged in a Protected Activity*

"An employee has engaged in protected activity when [he] has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Thompson v. Somervell Cty., Tex.*, 431 F. App'x 338, 341 (5th Cir. 2011). There is no dispute that Plaintiff filed an internal

complaint against his supervisor, Jamie Lively, on April 18, 2018. **See Exhibit T**. This complaint highlighted potential discriminatory action that Plaintiff indicated had been ongoing for some time.

*ii. Plaintiff Suffered an Adverse Employment Action*

There seemingly is no dispute that Plaintiff suffered an adverse employment action – termination. Plaintiff would apply his same argument to his retaliation claim as he did with his discrimination claim as it pertains to his adverse employment action. Plaintiff submits that the sudden campaign of warnings was Lively's intention to use the Defendant's tiered disciplinary structure. The three previous CAFs were noted as supporting information in CAF-4 which would indicate that the adverse employment action started which this disciplinary process was initiated in January 24, 2018. Plaintiff understood that the typical progression for employee discipline to be verbal warning, written warning, final written warning, and termination. (See **Exhibit Z;** Santana June 28, 2021 Dep. 66:10-15)

*iii. A Causal Connection Exists between the Protected Activity and Adverse Action*

The causal connection element is where the dispute lies with regards to this claim. As stated above, "[a]t the prima facie case [stage], a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action." *Garcia*, 938 F.3d at 243. To establish this causal connection, "temporal proximity, unfounded performance concerns, warnings from other employees not to engage in the protected activity, and disparate treatment" is enough. *Musser v. Paul Quinn Coll.*, 944 F.3d 557 (5th Cir. 2019).

First, Plaintiff will consider the concept of "temporal proximity" as the Defendant called the five (5) months between the internal complaint and termination insufficient. Initially, Plaintiff recognizes that the Fifth Circuit has stated that a "five month lapse is not close enough." See *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002). However, in this particular case, the five months represents the *filing* of the internal complaint – not when it was resolved. In fact, the

complaint was still open as the date of Plaintiff's termination and was not closed until September 28, 2018. The internal complaint, which Jamie Lively was aware of[7], was ongoing during Lively's issuance of CAF-3 and CAF-4.

When considering that the internal complaint was still ongoing at the time of termination together with the questions raised about Lively's supervision and motives behind his disciplinary actions as well as his treatment of the Plaintiff, there is a causal connection between the protected activity (internal complaint) and the adverse employment action (termination).

  b. Defendant's Proffered Reasons are Pretextual

Similarly to his claim for discrimination, Plaintiff must also establish pretext with regards to Defendant's proffered reasons for its action. "Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action" *Brown*, 969 F.3d at 578. Defendant cites to 'poor work performance' and again point to CAF-3 and CAF-4 to highlight Plaintiff's alleged violation, stating that CAF-3 and CAF-4 is consistent with the allegations of rude conduct submitted in CAF-2 prior to the internal complaint. This is misleading.

CAF-2 documented a misunderstanding between two General Managers which was clarified in an email the same day it happened. The 'investigator' of this incident did not even discuss this incident with Plaintiff before issuing a CAF a month later. (See **Exhibit Z;** Santana June 28, 2021 Dep. 87:3-8) Nevertheless, there was no customer complaints documented in CAF-2. The second allegation in CAF-2 was a charge of leaving the trucks in a state of disarray. However, Plaintiff wasn't even at work the day in question. The only thing CAF-2 establishes is Lively's inability to conduct a thorough investigation. Plaintiff has reiterated many times in this memorandum the issues with CAF-3 and CAF-4. Again, *at best*, the proffered documents, testimony, and information casts a doubt on the credence of Defendant's proffered reasons for its action.

---

[7] See **Exhibit Y**; Lively Dep. 27-29)

In order to avoid summary judgment, Plaintiff must show "a conflict in substantial evidence" on the question of whether the employer would not have taken the action "but for" the protected activity. *Feist v. Louisiana, Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). Evidence is substantial if it is of "such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions." *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998).

Plaintiff has noted that it was clear to him that Jamie Lively took issue with his disability given the change in his demeanor once he learned the severity of Plaintiff's impairment. (See **Exhibit Z**; Santana June 28, 2021 Dep. 27:5-12). After that, Plaintiff's long history with the Defendant without any significant disciplinary action was flipped on its head by Lively's sudden change of demeanor. First, it was humiliating Plaintiff in a meeting with other General Managers[8]. Then, Lively issued disciplinary warnings about an issue that had never really been a problem before, citing a checklist that Plaintiff had never been privy to.[9] Finally, on April 16, 2018, Lively 'investigated' a customer complaint by demanding an employee amend her observations to meet his narrative.[10] Once Plaintiff filed his internal complaint, the writing was on the wall and Lively proceeded his incessant campaign to build a case against Plaintiff with termination as the endgame. This came in the form of CAF-3 and CAF-4. While there is no direct evidence that the internal complaint ramped up Lively's efforts to build a case against Plaintiff – at minimum, it presents a question of fact that should survive summary judgment.

---

[8] See **Exhibit Z;** Santana June 28, 2021 Dep. 27-30.
[9] (See **Exhibit Z;** Santana June 28, 2021 Dep. 71-73).
[10] See Exhibit S.

### III. PLAINTIFF MADE GOOD FAITH ATTEMPTS TO MITIGATE HIS DAMAGES

The employer has the burden of proving failure to mitigate, and may do so by demonstrating that substantially equivalent work was available and that the plaintiff did not exercise reasonable diligence to obtain it. *Miles-Hickman v. David Powers Homes, Inc.,* 613 F. Supp. 2d 872, 887 (S.D. Tex. 2009).

Plaintiff had been on a roller coaster with Defendant over the past 13 years - being terminated multiple times for his inability to drive due to his disability and then reinstated within weeks all while his vision impairment worsened. Plaintiff did the best he could to mitigate his damages by filing for SSDI benefits – which were approved. As stated in his affidavit offered in support of this Response, he provided the only stream of income for his family. After his abrupt termination and a designation as "do not rehire" by Defendant, Plaintiff knew that his ability to find substantially equivalent work would be difficult given the nature and severity of his impairment in comparison to when he first started with Defendant.

The reasonableness of Plaintiff's efforts and diligence "should be evaluated **in light of the individual characteristics of the claimant** and the job market." *Sellers v. Delgado Coll.,* 902 F.2d 1189, 1193 (5th Cir. 1990)[emphasis added]. Moreover, substantially equivalent employment is that which "affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Id.* Considering Plaintiff's individual circumstances, he felt that applying for disability benefits was the best way to mitigate his loss of pay given the severity of his vision impairment and the niche work that he was doing with the Defendant with the accommodations that he was receiving.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the Court DENY the Defendant's Motion for Summary Judgment and permit this matter to move forward.

**<<SIGNATURE ON NEXT PAGE>>**

This the 15th day of February, 2022.

                                        Respectfully submitted,
                                        BY:  __/s/ *Greta Kemp Martin*_____
                                              GRETA KEMP MARTIN, MSB# 103672

**Attorney for the Plaintiff:**
GRETA K. MARTIN, MSB #103672
DISABILITY RIGHTS MISSISSIPPI
5 OLD RIVER PLACE, SUITE 101
JACKSON, MISSISSIPPI  39202
Office: (601) 968-0600
Facsimile: (601) 968-0665
Email:  gmartin@drms.ms

## CERTIFICATE OF SERVICE

I, undersigned counsel, do hereby certify that a true and correct copy of the foregoing discovery requests will be provided to all counsel of record and necessary parties and this notice will be provided to the same via this Court's electronic filing system.

THIS the 15th day of February, 2022.

Respectfully submitted,

___/s/*Greta Kemp Martin*_____

GRETA KEMP MARTIN, MSB# 103672
DISABILITY RIGHTS MISSISSIPPI
5 OLD RIVER PLACE, SUITE 101
JACKSON, MISSISSIPPI 39202
Office: (601) 968-0600
Facsimile: (601) 968-0665
Email: gmartin@drms.ms