IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSÉ JOAQUIN SANTANA, JR. | § | PLAINTIFF |
| | § | |
| | § | |
| v. | § | Civil No. 1:19cv241-HSO-RHWR |
| | § | |
| | § | |
| AARON'S, INC. | § | DEFENDANT |

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT
AARON'S, INC.'S MOTION [98] FOR SUMMARY JUDGMENT**

**BEFORE THE COURT** is Defendant Aaron's, Inc.'s Motion [98] for

Summary Judgment, which is fully briefed.  Having considered the Motion, the

related pleadings, the record, and relevant legal authority, the Court is of the

opinion that Defendant's Motion [98] for Summary Judgment should be granted,

and that Plaintiff José Joaquin Santana, Jr.'s claims should be dismissed with

prejudice.

## I. BACKGROUND

A.  Factual background

This case arises out of Plaintiff José Joaquin Santana, Jr.'s ("Plaintiff" or

"José") termination from his employment with Aaron's, Inc. ("Defendant" or

"Aaron's").  *See* Am. Compl. [26] at 1, 3.   Plaintiff, who is a Hispanic male,

underwent surgery for a brain tumor around October 2012, which caused the loss of

his peripheral vision, *see* EEOC Charge [26-2] at 4; Ex. [104-12] at 10 (filed

restricted access), and he is now considered legally blind, *see* Pl. Dep. [108-26] at 33.

Aaron's is a rent-to-own retailer which owns stores across the United States. *See* EEOC Charge [26-2] at 4. In January 2016, Plaintiff became the General Manager of Defendant's store in D'Iberville, Mississippi. *See* Rhinehart Aff. [108-4] at 1. According to Plaintiff's former supervisor, Sam Rhinehart ("Rhinehart"), he "did a great job managing the store," and Rhinehart was "not aware of any concerns or complaints made about [Plaintiff's] work." *Id.* at 2. Rhinehart has averred that Plaintiff's disability did not affect his performance. *See id.*

In late 2016, Plaintiff voluntarily surrendered his driver's license due to his vision loss, *see* Ex. [108-8] at 1-2, even though it is undisputed that driving was part of the job description for a general manager's position, *see* Pl.'s Dep. [108-26] at 54. Defendant nevertheless accommodated Plaintiff's request not to drive. *See id.* at 55. According to Plaintiff, he "was performing the essential functions and duties of [his] job, with the exception of the driving requirement." Pl. Aff. [108-28] at 2.

In late 2017, Jamie Lively ("Lively") became the regional manager who supervised Plaintiff. *See id.* at 55; Lively Dep. [108-25] at 14-15. Lively stated that he was immediately aware of Plaintiff's visual impairment because Plaintiff "had a [sic] glasses that blacked out -- blocked out one eye." Lively Dep. [108-25] at 31. Lively testified that Plaintiff's inability to drive "wasn't an issue." *Id.*

Plaintiff received several reprimands during the time Lively supervised him. On January 24, 2018, Lively issued Plaintiff a verbal counseling writeup, through a Corrective Action Form ("CAF-1"). *See* Pl. Dep. [108-26] at 68; Ex. [104] at 2 (filed restricted access). Specifically, on August 24, 2017, Lively had observed "a dolly

2

and excessive trash left in one of the Aaron's company vehicles," Ex. [111-8] at 1 (filed restricted access), and on December 21, 2017, he "found dryer cords, blankets, customer delivery receipts, customer information forms and trash in one of the Aaron's company vehicles," *id*. Then, on January 19, 2018, Lively discovered similar items. *Id*. CAF-1 stated that Plaintiff should complete the end-of-the day checklist to ensure "the trucks are clean with nothing on the inside." *Id*.

In March 2018, Plaintiff received another written warning ("CAF-2") from Lively concerning an incident that occurred on or around February 12, 2018, between Plaintiff and the general manager of Defendant's fulfillment center, Steve Smith ("Steve"). *See* Ex. [111-11] at 1 (filed restricted access). Over the course of several telephone calls between Plaintiff and Steve about the need for Plaintiff to return four dryers to the fulfillment center, he "rudely, sarcastically, hung up on them, accused Steve of 'trying to screw the stores over,'" and told another employee that he will "never help [the fulfillment center] again." *Id.*; *see also* Ex. [111-2] at 1-2; Ex. [111-13] at 1-2. CAF-2 also referenced an incident from March 14, 2018, where Lively again discovered items left in a truck that should not have been present. *See* Ex. [111-11] at 1 (filed restricted access). Lively's goals were for Plaintiff to speak respectfully and professionally to all with whom he came into contact, and to perform the "end of the day checklist or visually verify . . . that the company trucks or rentals are empty of the following: customer information sheets, dollies, tools, appliance hookups, trash, and/or blankets." Ex. [111-11] at 1 (filed restricted access).

3

On April 16, 2018, Lively received a customer complaint concerning Plaintiff. *See id.* An employee at the D'Iberville store, Kaila Smith ("Smith" or "Kaila"), witnessed the incident. *See* Smith Aff. [108-19] at 1. At Lively's request, Smith e-mailed him a statement:

> [y]esterday morning (4/16/2018), several customers came in at 10 a.m. I was doing inventory and Jose was going between the office and warehouse getting merchandise and paperwork ready for delivery when he mentioned that we weren't open yet. He said it jokingly, but I could understand where a customer who doesn't know him would be upset. The customers at the counter laughed because they know how he is, but the customers who were shopping did not take it as a joke. He did ask me where the customers went after they left because he didn't realize they got upset about it. He also mentioned to me personally that his watch was 5 minutes behind, and while he was joking about them being there early, he really did think it was before 10. Jose is a great boss, but some people don't get his sense of humor a lot of the time. Most customers will tell you they love Jose, but some will not deal with him.

Ex. [108-17] at 1.

Lively forwarded this statement to Danielle Riecke ("Riecke" or "Danielle"), who worked in Defendant's "Associate Resources" department, *see id.*, and informed Riecke that "[t]he statement Kaila emailed me was different than what she told me over the phone yesterday. I contacted her and asked her to send me an addendum including the details she told me over the phone yesterday," Ex. [108-18] at 1. Smith's revised statement recounted that,

> [t]he customer approached me and mentioned how they were from Texas and needed furniture and it was very rude how Jose greeted them. I apologized several times and she asked me for the number to corporate office. She called the store a couple hours later asking for his name and position and I gave it to her. I know this has happened before, but I have never witnessed or been directly involved or approached by a customer who it has happened to.

*Id.* at 2.

In an Affidavit [111-18] submitted in support of Plaintiff's opposition to summary judgment, Smith avers that after she submitted her original statement, "[a]lmost immediately, [she] was contacted by Jamie Lively who demanded [she] amend [her] statement."  Smith Aff. [111-18] at 1 (filed restricted access). According to Smith, she e-mailed the second statement "to reflect more what the customer relayed to [her] about the incident," but she maintains that her "original statement more accurately reflects [her] personal observations."  *Id.* at 2.  Smith states that after she submitted her amended statement, Lively called her and told her "that it still 'would not work' and hung up the phone."  *Id.*

"Shortly after this, [Smith] communicated with Danielle Riecke that [she] felt uncomfortable writing a statement and felt very pressured to write [it]" because she "felt like [she] was being used to create a narrative against [Plaintiff]" and that the D'Iberville store was "being targeted."  *Id.*   Smith informed Riecke that the "customer incident was not a big deal and that [she] did not understand why it was being investigated," as Plaintiff "had great customer service," and any negative interactions were immediately resolved by Plaintiff.  *Id.* at 2.  Smith believed that "Lively took issue with Jose as a General Manager and it was unclear why given that Jose was a good boss and the store was performing well."  *Id.*  Following this incident, Lively wished to terminate Plaintiff, but Riecke recommended a final written warning.  *See* Ex. [111-9] at 4 (filed restricted access).

On April 19, 2018, before any corrective action had been taken against Plaintiff, he called the "Aaron's Cares Hotline" to complain about Lively. *See id.*; Ex. [108-21] at 1; Ex. [111-19] at 1 (filed restricted access). Plaintiff reported that Lively "keeps fishing for something wrong" and claimed that Lively had a "personal issue with either Jose's race and/or disability because there is [sic] no major problems with Jose's record professionally." Ex. [111-19] at 1 (filed restricted access). Plaintiff did not offer any specific reasons why he believed he was being targeted because of his race or disability. Plaintiff reported that the issue had been ongoing for three months to a year and cited the pressure Lively exerted on Smith to make her statement more detailed. *See id.* at 2-3.

According to Plaintiff, Lively had not specifically stated that his loss of vision and inability to drive were issues, but in the months prior to April 2018, there were "notable changes." Ex. [108-21] at 1. In an April 29, 2018, written statement, Plaintiff recounted:

> Jamie no longer spends his visits in the office, with the staff and I [sic], but instead closes himself in the closing room, occasionally leans out asking us questions, then leaves abruptly. As most store numbers were increasing, Jamie offered no praise, only a threat of termination if club sales did not increase. At the March P&L meeting I commented on my stores top numbers and immediately Jamie stated I was worst on Club sales, again shooting me down and only offering negativity. Recently [Jamie] wrote me up because another GM said I was rude to him and Jamie had not himself been present for conversations or a part of the situation. When I tried to explain what happened, Jamie did not want to hear or allow me to state my side of the situation, telling me "it doesn't matter." And most recently with Jamie aggravatingly stating to Kaila "this isn't going to work" when a statement Jamie had requested from her, apparently, wasn't enough.

>Since I have no major issues professionally, this leads me to believe that Jamie has a personal issue with me, my race or visual disability.

*Id.*

Plaintiff testified in his deposition that Lively had "a change of attitude . . . once he found out [Plaintiff] was not able to drive due to [his] disability," Pl. Dep. [108-26] at 26, and that evidence of the change included Lively's writeups and his behavior towards Plaintiff, which went from "very friendly, very positive" to "cold and distant" and being "extremely . . . picky about all the things he would write [Plaintiff] up for that he would not – did not – to the best of [Plaintiff's] knowledge, did not do to any other manager, as a pretext to terminate [Plaintiff] for [his] disability." *Id.* at 27. Plaintiff asserted that at regional meetings with other general managers, Lively was "very friendly and jokingly [sic] attitude with other GMs, which was the opposite of what he was towards [Plaintiff] after finding out about [his] disability." *Id.* at 29-30. Lively allegedly "put [Plaintiff] down in front of everybody, while never doing that to anybody else," including "[b]y pointing out the one deficiency [Plaintiff] had and making a statement that [Plaintiff's] employment would be in jeopardy if it was not improved, in front of everybody." *Id.* at 30.

The corrective action recommended by Riecke for the customer complaint "was placed on hold due to GM Jose calling the Aaron's Cares line, to allow [Riecke] to investigate Jose's concerns." Ex. [111-19] at 4 (filed restricted access). However, on or about May 8, 2018, Plaintiff received a third Corrective Action Form ("CAF-3") that was a "Final Written Warning," stating that Plaintiff had violated certain rules

of conduct involving position responsibilities and unprofessional conduct.  *See* Ex. [111-14] at 1 (filed restricted access).  According to CAF-3, Defendant had received four different customer complaints from April 16 to May 7, 2018.  *Id.*  Plaintiff was cautioned that "[a]ny subsequent infraction of the same or related nature will result in further disciplinary action up to and including termination."  *Id.*

Several months later, on September 13, 2018, Plaintiff was purportedly "rude and acted inappropriately to a guest in the store," in violation of Defendant's rules of conduct, and he was terminated effective September 18, 2018.  *See* Ex. [111-23] at 1 (filed restricted access) ("CAF-4").  Plaintiff testified that although no one told him that he was fired because he was legally blind, "[t]he pretext of the writeups was used" to terminate him, and at the time he was terminated, the investigation concerning his complaints regarding Lively was still ongoing.  Pl.'s Dep. [108-26] at 33.

Plaintiff's report to the Aaron's Cares Hotline was purportedly investigated, but according to Riecke, Plaintiff's allegations that Lively had an issue with his "race and/or disability was not substantiated." Ex. [111-19] at 4 (filed restricted access).  An entry dated September 28, 2018, on Defendant's "EthicsPoint Incident Management" report concerning the complaint stated that "[t]he investigation of this matter has been completed, and appropriate action has been taken."  *Id.* at 3.  By the time of this final entry, however, Plaintiff had already been terminated.  *See* Ex. [111-23] at 1-2 (filed restricted access).

Following his termination, Plaintiff applied for Social Security Disability Insurance ("SSDI") benefits, which "seemed like the most logical answer at the time to provide financial stability," as he "had to find a stream of income for [his] family while [he] determined if [he] could find gainful employment with [his] restrictions." Pl. Aff. [108-28] at 2.

B.    Procedural history

Plaintiff filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") claiming that he "was disciplined and harassed due to [his] disability and national origin, Hispanic" and terminated "because [he] complained of discrimination and because of [his] disability and national origin." EEOC Charge [26-2] at 10.   After the EEOC issued a Dismissal and Notice of Rights [26-2] letter, Plaintiff filed a pro se Complaint [1] in this Court on April 17, 2019, referencing "Title VII, the Americans with Disabilities Act as the Plaintiff is legally blind."  Compl. [1] at 1. Plaintiff filed an Amended Complaint on March 30, 2020, asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA").  Am. Compl. [26] at 1-2.  Defendant filed a Motion [27] to Dismiss the Amended Complaint [26], which the Court granted in part and denied in part and dismissed Plaintiff's Title VII discrimination or disparate treatment claims.  *See* Order [41] at 14.  The claims for discrimination under the ADA and for retaliation under the ADA and Title VII remain.  *See id.*

9

Defendant has now filed the present Motion [98] for Summary Judgment arguing that Plaintiff has failed to make out a prima facie case of discrimination under the ADA or for retaliation under either the ADA or Title VII.  *See* Mot. [99] 15-18, 20-25.   Defendant contends that it has further offered evidence of legitimate nondiscriminatory and nonretaliatory reasons for its action, and Plaintiff has failed to "produce substantial evidence showing pretext."  *Id.* at 28.   Alternatively, Defendant asserts that the Court should enter judgment in its favor on its affirmative defense that Plaintiff failed to mitigate damages.  *See id.* at 27-28.

Plaintiff responds that his ADA discrimination claim survives summary judgment because he has satisfied his prima facie case under the *McDonnell Douglas* framework and has submitted "significant proof that the reasons [articulated by Defendant] are pretextual," or that "there is at least a mixture of motives behind Defendant's actions."  Resp. [108] at 9-10 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also id.* at 10-17.   Plaintiff maintains that his claims for retaliation can withstand summary judgment for the same reasons. *See id.* at 17-21.

With respect to mitigation of damages, Plaintiff contends that he "did the best he could to mitigate his damages by filing for SSDI benefits – which were approved" and "provided the only stream of income for his family."  *Id.* at 22. Plaintiff "knew that his ability to find substantially equivalent work would be difficult given the nature and severity of his impairment," and he claims that he made good faith efforts to mitigate his damages.  *Id.*

## II. DISCUSSION

A.   Summary judgment standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant satisfies this burden, the nonmovant must present evidence beyond the pleadings that demonstrates "specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). To rebut a properly supported motion for summary judgment, the nonmovant must show, with "significant probative evidence," that there exists a genuine issue of material fact for resolution at trial. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

In deciding whether summary judgment is appropriate, the Court views all facts and inferences in the light most favorable to the nonmovant. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 858 (5th Cir. 2010). Conclusory allegations and unsubstantiated assertions are not enough to survive a motion for summary judgment. *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir. 1996). If the nonmoving party does not present sufficient evidence to establish an essential element of his claim, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). However, when a party moving for summary judgment bears the burden of proof on an issue such as an affirmative defense, it "must establish beyond peradventure *all* of the essential elements of the defense to

11

warrant judgment in his favor." *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010) (emphasis in original) (quotation omitted).

B.    Plaintiff's ADA discrimination claim

1.    Relevant legal authority

"The ADA prohibits discrimination against a qualified individual based on the individual's disability." *Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 525 (5th Cir. 2022) (citing 42 U.S.C. § 12112(a); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)).  A plaintiff may rely upon direct evidence, circumstantial evidence, or both to show disability discrimination.  *See id.*  "Plaintiff in this case concedes that he is offering circumstantial evidence with regard to the allegations set forth in this matter."  Mem. [108] at 9.  The *McDonnell Douglas* burden-shifting framework applies to cases involving circumstantial evidence.  *See id.*; *Gosby*, 30 F.4th at 525; *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under *McDonnell Douglas*, a plaintiff makes a prima facie showing of disability discrimination by presenting evidence that he was (1) disabled within the meaning of the ADA, (2) qualified for the job, and (3) was subject to an adverse employment action on account of his disability.  *See Gosby*, 30 F.4th at 526; *Jennings v. Towers Watson*, 11 F.4th 335, 344 (5th Cir. 2021).  "Adverse employment decisions are ultimate employment decisions such as hiring, granting leave, discharging, promoting, compensating, or demoting."  *Thompson v. Microsoft Corp.*, 2 F.4th 460, 470 (5th Cir. 2021) (quotation omitted).  If a plaintiff establishes

a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action.  *See Gosby*, 30 F.4th at 527; *Thompson*, 2 F.4th at 470.  "If the employer does so, the burden returns to the plaintiff to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual."  *Gosby*, 30 F.4th at 526 (quotation omitted).

If a plaintiff cannot demonstrate pretext, he "can still survive summary judgment by showing that an employment decision was 'based on a mixture of legitimate and illegitimate motives . . . [and that] the illegitimate motive was a motivating factor in the decision.'"  *LHC Grp., Inc.*, 773 F.3d at 702 (alterations in original) (quoting *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005)).  In a "mixed-motive case," a plaintiff "need only prove that the illegitimate motive was a motivating factor in the decision."  *Machinchick*, 398 F.3d at 355.  In this case, Plaintiff alleges that there was "at least a mixture of motives behind Defendant's actions."  Resp. [108] at 9-10.

2.    Plaintiff's prima facie case and Defendant's reason for termination

In this case, even if Plaintiff can establish a prima facie case of disability discrimination, summary judgment is nevertheless appropriate.  A court must not "assess the employer's credibility or the truthfulness of its reason," but it may consider pre-decision examples of alleged poor work performance by the plaintiff of which the decisionmaker was aware when the decision to terminate was made. *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231 (5th Cir. 2015). Defendant states that it terminated Plaintiff because "CAF-4 describes a September

13, 2018 incident with a customer—one example of customer mistreatment in a long line of similar prior incidents documented in CAF-2 and CAF-3." Mem. [99] at 18. Lively issued CAF-2, CAF-3, and CAF-4 to Plaintiff for violations of rules of conduct, position responsibilities, and inappropriate conduct.   *See* Ex. [104-1] at 2-3 (filed restricted access); Ex. [104-2] at 2-3 (filed restricted access); Ex. [104-3] at 2-3 (filed restricted access).  Defendant contends that Plaintiff's behavior documented in these forms reflects repeated violations of Defendant's policies as stated in its Policy Manual. *See, e.g.,* Mem. [99] at 18-19.

"Terminating an employee whose performance is unsatisfactory according to management's business judgment is legitimate and nondiscriminatory as a matter of law." *LHC Grp., Inc.*, 773 F.3d at 701-02.  Therefore, the alleged conduct reflected in the CAFs is sufficient for Defendant to carry its burden of production. *See Burton*, 798 F.3d at 231.

3.   Pretext

The burden shifts to Plaintiff to produce competent summary judgment from which a reasonable jury could conclude that Defendant's articulated reason is pretextual.  *See Gosby*, 30 F.4th at 526; *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017).   Plaintiff argues that he has rebutted the legitimacy of CAF-2, CAF-3, and CAF-4, on which Defendant's termination was premised, as a "campaign to eliminate Plaintiff from his job due to his disability."  Resp. [108] at 14; *see id.* at 15-16.  However, even if "the issuance of the CAFs may have stemmed

from actual occurrences, . . . he was held to a different standard than is expected" of other general managers under Lively's supervision. *Id.* at 16.

At this stage, temporal proximity between a plaintiff's disclosure of his impairments to his employer and his termination is not enough, but "[t]he combination of suspicious timing with other *significant* evidence of pretext, can be sufficient to survive summary judgment." *Burton*, 798 F.3d at 240 (emphasis added). "An employee seeking to show pretext must rebut each discrete reason proffered by the employer." *Id.*

"The focus of the pretext inquiry is not whether [its reason for termination] was accurate but whether [the employer] reasonably believed its non-discriminatory reason for discharging [the plaintiff] and then acted on that basis." *Kitchen v. BASF*, 952 F.3d 247, 253 (5th Cir. 2020). Inconsistent explanations and the absence of clear criteria for how employees were assessed for termination is evidence tending to show that an employer's proffered explanation for termination is false or unworthy of credence. *See Gosby*, 30 F.4th at 528. However, "[a] subjective belief of discrimination cannot be the basis of judicial relief." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016); *see also Johnson v. Parkwood Behav. Health Sy*s., 551 F. App'x 753, 756 (5th Cir. 2014) (holding that a plaintiff's general accusations, speculation, and own subjective belief of ADA discrimination are inadequate to overcome summary judgment).

a.   <u>Whether Plaintiff has shown that each of Defendant's proffered reasons are false</u>

Plaintiff contends that he has "rebutted each of the CAFs upon which Defendant rests its decision" and that each "is rooted in questionable motive that the Plaintiff has offered supporting documents, sworn testimony, and other evidence to rebut," and that Defendant's explanation for his termination is unworthy of credence. *See* Resp. [108] at 15. Later in his Response [108], Plaintiff also states that he received some of the CAFs because he was "held to a different standard than is expected" from other managers. *See id.* at 16.

At the pretext stage the question is not whether Defendant's reason for terminating Plaintiff was correct, but whether Defendant reasonably believed its reason and acted on that basis. *See Kitchen*, 952 F.3d at 253. In support of his pretext argument, Plaintiff asserts that each of the CAFs was "part of a campaign to eliminate Plaintiff from his job due his disability," Resp. [108] at 14, and that Lively had a "questionable motive" in issuing the CAFs, *id.* at 15.

Defendant maintains that CAF-1, CAF-2, and CAF-3 did not constitute actionable adverse employment actions. *See* Mem. [99] at 16. The Court agrees, and to the extent Plaintiff relies upon CAF-1, CAF-2, and CAF-3 to advance independent ADA claims, such claims necessarily fail because an ADA discrimination claim can only be based on an ultimate employment decision. *See Thompson*, 2 F.4th at 470.

However, Plaintiff maintains that Defendant's proffered reason for his termination based upon this string of CAFs was pretextual because the CAFs

16

themselves "were part of a campaign to eliminate Plaintiff from his job due to his disability." Resp. [108] at 14.   CAF-4, which actually terminated Plaintiff, references the prior corrective actions, including CAF-2 and CAF-3, *see* Ex. [111-23] at 1 (filed restricted access), and Defendant cites CAF-4 as "one example of customer mistreatment in a long line of similar prior incidents documented in CAF-2 and CAF-3," Mem. [99] at 18.   The Court will therefore consider Plaintiff's argument that whether Defendant reasonably believed the veracity of CAF-2 and CAF-3 could bear on the issue of pretext concerning its ultimate employment decision in CAF-4.  *See Kitchen*, 952 F.3d at 253.

Plaintiff asserts that the reasons provided in CAF-2 "were misconstrued over a month later by Lively to paint the Plaintiff in a negative light," and "the secondary allegation in this CAF was made against Plaintiff on a day that he was not even at work." Resp. [108] at 14.  As for CAF-3, Plaintiff contends that the fact that Lively "demanded" that Smith change her statement while he was investigating a customer complaint "should call his methods of investigation as a whole into question." *Id*.  Finally, Plaintiff complains that CAF-4 came "on the heels of the previous CAFs issued by Jamie Lively – all of which have been called into question by his actions." *Id*.

Although Plaintiff has proffered some explanation and evidence to argue that some of the complaints in CAF-2 and CAF-3 about his job performance may have been debatable, he has not rebutted each discrete reason proffered by Defendant for his termination. *See Burton*, 798 F.3d at 240.   For instance, in CAF-2 Plaintiff

17

focuses on the incident concerning the fulfillment center and his failure to ensure that a truck was cleaned out on a day he was not at work. *See* Resp. [108] at 14. But Plaintiff does not address or dispute a separate incident referenced in CAF-2 involving failure to clean two of the trucks, *see* Ex. [111-11] at 1 (filed restricted access), which was the same performance issue that had resulted in CAF-1, *see* Ex. [104] at 2 (filed restricted access).

Similarly, with respect to CAF-3, Plaintiff focuses on only one customer complaint regarding an incident that occurred on April 16, 2018, after which Lively requested Smith provide a statement and then "demanded" that she amend it. *See* Smith Aff. [108-19] at 1; *see also* Resp. [108] at 14. However, this was not the only customer complaint for which Plaintiff was disciplined. CAF-3 identifies three other customer complaints between April 28, 2018, and May 7, 2018, which Plaintiff has not addressed or attempted to dispel. *See* Ex. [111-14] at 1 (filed restricted access); Resp. [108] at 14.

Finally, Plaintiff's only complaint about the credence of CAF-4 is that it comes "on the heels of the previous CAFs issued by Jamie Lively – all of which have been called into question by his actions." Resp. [108] at 14. But CAF-4 post-dated CAF-3 by four months, and Plaintiff has not challenged the legitimacy of every ground upon which CAF-2 and CAF-3 were based, cutting against his argument that CAF-4 is somehow the fruit of their poisonous trees. Nor has Plaintiff cited any evidence to demonstrate, or even attempted to articulate how, Defendant did not reasonably believe its stated non-discriminatory reason for issuing CAF-4.

18

According to CAF-4, Plaintiff "was rude and acted inappropriately to a guest in the store." Ex. [111-23] at 1 (filed restricted access). Plaintiff has not in any way challenged the veracity of this allegation, and he has not demonstrated that Defendant did not reasonably believe Plaintiff had engaged in this conduct. Simply put, Plaintiff has not adequately rebutted each of Defendant's reasons for his termination. *See Burton*, 798 F.3d at 240.

Plaintiff also attempts to undermine the truthfulness of the CAFs by arguing that Lively had a "questionable motive" in issuing them. Resp. [108] at 15. To support his claim, Plaintiff testified that Lively's writeups and change in attitude began only after Lively learned of Plaintiff's disability. *See* Pl. Dep. [111-25] at 26-27 (filed restricted access). However, Plaintiff does not cite any evidence that even approximates when Lively discovered he had a disability or when Lively's purported change in attitude began. *See id.*; *see also, e.g.,* Resp. [108] at 21 (referring to "Lively's sudden change of demeanor" once he learned the severity of Plaintiff's behavior, without citing evidence as to when either event occurred). In contrast, Lively has presented competent evidence that he became immediately aware of Plaintiff's disability when he took over as regional manager due to the vision preclusion device Plaintiff wore over one eye. *See* Lively Dep. [108-25] at 30-31. This cuts against Plaintiff's argument that each of the CAFs "is rooted in [Lively's] questionable motive." Resp. [108] at 15. What remains is Plaintiff's subjective belief of disability discrimination, which is insufficient to support a discrimination claim under the ADA. *See Delaval*, 824 F.3d at 480.

b.   <u>Whether Plaintiff has shown disparate treatment</u>

Plaintiff also argues disparate treatment as a way of showing pretext. Disparate treatment is one possible way to show pretext. *See Gosby*, 30 F.4th at 527; *Kitchen*, 952 F.3d at 253. Plaintiff argues that "he was treated differently than the other General Managers supervised by Lively." Resp. [108] at 4. "[F]or a plaintiff to show disparate treatment, he must demonstrate that the misconduct for which he was discharged is 'nearly identical' to that engaged in by an employee outside of his protected class whom the employer retained." *McCollum v. Puckett Mach. Co.*, 628 F. App'x 225, 230 (5th Cir. 2015). When a plaintiff fails to adduce any evidence that employees who were not terminated "engaged in nearly identical conduct to that for which he was terminated" or that the "employees were outside his protected class," he fails to create a question of fact on whether his employer's proffered reason for terminating him was pretextual. *Id.*

In *McCollum*, the plaintiff attempted to show disparate treatment and testified that "a dozen or so" unnamed employees of the defendant had violated the same work policy but had not been terminated. *Id.* Because McCollum failed to "present any evidence that the unnamed employees who were not terminated for drug or alcohol infractions engaged in nearly identical conduct to that for which he was terminated" and did not "adduce any evidence that those unnamed employees were outside of his protected class," the Fifth Circuit affirmed the grant of summary judgment on the ADA claim in that case. *Id.* The Court here is faced with a similar situation on Plaintiff's comparator argument.

20

Plaintiff testified in his deposition that Lively was "picky about all the things he would write [Plaintiff] up for that he would not -- did not -- to the best of [Plaintiff's] knowledge, did not do to any other manager, as pretext to terminate [him] for [his] disability."  Pl. Dep. [111-25] at 27 (filed restricted access).  However, Plaintiff has not pointed to any evidence demonstrating that the managers whom Lively purportedly treated more favorably were not disabled; instead, he generally refers to the treatment of all other general managers.  *See* Resp. [108]; *see also McCollum*, 628 F. App'x at 230.  Moreover, Plaintiff admitted that he had no personal knowledge of any discipline other general managers received from Lively, "[w]ith the exception of [their] district meetings," Pl. Dep. [111-25] at 27 (filed restricted access), and he has offered no evidence to show that any other general manager was not terminated under nearly identical circumstances for nearly identical conduct, *see* Resp. [108]; *see also McCollum*, 628 F. App'x at 230.

Plaintiff references "at least two" in-person regional meetings with Lively and other general managers where Lively would speak to the managers, ask questions, and provide answers to questions.  Pl.'s Dep. [111-25] at 27-29 (filed restricted access).  Plaintiff claims that, during those meetings, Lively "was very friendly and jokingly [sic] attitude with the other GMs, which was the opposite of what he was towards [Plaintiff] after finding out about [his] disability," and Lively would "put [Plaintiff] down in front of everybody, while never doing that to anybody else."  *Id.* at 29-30.  According to Plaintiff, Lively would "point[ ] out the one deficiency [Plaintiff] had and mak[e] a statement that [Plaintiff's] employment

21

would be in jeopardy if it was not improved, in front of everybody," *id.* at 30; likewise, even though Plaintiff "had a lot of leading categories, he never observed those, for the most part, as much as he would others," *id.* at 31.   The deficiency involved "Aaron's Club sales," *id.* at 30, but Plaintiff was never formally written up about this issue, *see id.* at 31.

Plaintiff has pointed to no evidence to establish whether any of these other general managers were non-disabled,[1] *see* Resp. [108]; *see also McCollum*, 628 F. App'x at 230, nor has he established that any other, non-disabled manager had the same deficiencies in their performance but was not similarly critiqued by Lively at meetings, *see McCollum*, 628 F. App'x at 230.  This is insufficient to show disparate treatment, and Plaintiff has not demonstrated pretext.

4.   Mixed-motive alternative

To survive summary judgment on the disability discrimination claim under his alternative mixed-motive theory, Plaintiff must present evidence that Defendant's employment decision was based on a mixture of legitimate and illegitimate reasons and that the illegitimate reason was a motivating factor in the termination decision.  *See LHC Grp., Inc.*, 773 F.3d at 702.  In other words, "discrimination need not be the sole reason for the adverse employment decision so long as it actually plays a role in the employer's decision making process and has a determinative influence on the outcome."  *Id.* (quotation omitted).

---

[1] While it is unclear when these regional meetings occurred, Plaintiff testified that one took place before he believes Lively was aware of his disability. Lively's conduct during that meeting would be irrelevant to the pretext inquiry.

Based upon a review of the record, Plaintiff has not cited competent summary judgment evidence from which a reasonable factfinder could conclude that a discriminatory reason was a motivating factor, or played any role at all, in Defendant's decision. *See id.* There is simply no evidence Plaintiff has cited, beyond his own subjective belief, from which a reasonable factfinder could find that the termination was motivated by Plaintiff's disability rather than by his work performance.

No matter how sincerely Plaintiff may believe that he suffered disability discrimination, a "subjective belief of discrimination . . . cannot be the basis of judicial relief." *Delaval*, 824 F.3d at 480 (quotation omitted). Even if Plaintiff has cited evidence that the facts underlying one or more of his disciplinary writeups and termination were incorrect, a decisionmaker is not required to make correct decisions, only non-discriminatory ones. *See Clark v. Boyd Tunica, Inc.*, 665 F. App'x 367, 372 (5th Cir. 2016). Plaintiff cannot support a case of disability discrimination under the ADA, and summary judgment is appropriate on this claim.

C.   ADA and Title VII retaliation claims

1.   Relevant legal authority

Both the ADA and Title VII prohibit retaliation against an employee who engages in a protected activity. *See* 42 U.S.C. §§ 12203(a) & 2000e-3(a). In this case Plaintiff appears to assert that CAF-3 and CAF-4 constituted retaliation for his internal complaint to the Aaron's Cares Hotline. *See* Resp. [108] at 19 (stating that "[t]he three previous CAFs were noted as supporting information in CAF-4 which

23

would indicate that the adverse employment action started which this disciplinary process was initiated in January 24, 2018," which was the date CAF-1 was issued). As Defendant points out, as a matter of law both CAF-1 and CAF-2 cannot support a retaliation claim because they both predated Plaintiff's call to the Hotline. *See* Mem. [99] at 21 n.14; *see also, e.g., Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 1000 (5th Cir. 2022) (holding that an employee who did not engage in protected activity before an employment decision fails to make a prima facie case of retaliation).

When a plaintiff presents indirect evidence of unlawful retaliation under either the ADA or Title VII, courts apply the *McDonnell Douglas* burden-shifting framework. *See Lyons*, 964 F.3d at 304; *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003). To establish a prima facie case of unlawful retaliation under either the ADA or Title VII, a plaintiff must show that: (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action. *Lyons*, 964 F.3d at 304; *Ackel*, 339 F.3d at 385. If the employee establishes a prima facie case of retaliation, the employer must come forward with a legitimate, nonretaliatory reason for its action. *See Lyons*, 964 F.3d at 304. If the employer meets this burden of production, "the employee must then demonstrate that the proffered reason is a pretext for retaliation." *Id.*

2.   Analysis

Even if Plaintiff can establish a prima facie case of retaliation, summary judgment on his retaliation claims is nevertheless appropriate.  To carry its burden of production, Defendant states that it terminated Plaintiff because "CAF-4 describes a September 13, 2018 incident with a customer—one example of customer mistreatment in a long line of similar prior incidents documented in CAF-2 and CAF-3."  Mem. [99] at 18; *see also* Ex. [104-1] at 2-3 (filed restricted access); Ex. [104-2] at 2-3 (filed restricted access); Ex. [104-3] at 2-3 (filed restricted access). Defendant takes the position that Plaintiff's behavior documented in these forms reflected repeated violations of Defendant's policies, justifying termination.  *See, e.g.,* Mem. [99] at 18-19.  This is sufficient for Defendant to carry its burden of production.  *See Lyons*, 964 F.3d at 304.

In order to show Defendant's proffered reason was pretext for retaliation, Plaintiff must ultimately demonstrate that "'but for' the protected activity, the adverse employment action would not have occurred."  *Lyons*, 964 F.3d at 304 (quotation omitted) (ADA case); *see also Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996) (Title VII case).   "Even if a plaintiff's protected conduct is a substantial element in a defendant's adverse employment action, no liability for unlawful retaliation arises if the employee would have faced that discipline even without the protected conduct."  *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 437 (5th Cir. 2022).

25

The Fifth Circuit has held that a plaintiff may establish pretext by showing that a retaliatory motive more likely motivated the ultimate employment decision, "such as through evidence of disparate treatment, or that [his] employer's explanation is unworthy of credence." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020), *as revised* (Aug. 14, 2020) (quotation omitted). When a plaintiff relies upon disparate treatment, he must show that his termination was taken "under nearly identical circumstances as those faced by the comparator," meaning that they held the same job responsibilities, shared the same supervisor, and had "essentially comparable violation histories." *Id.* at 580 (quotations omitted). Disparate treatment of "less similarly situated comparators" constitutes "some evidence of pretext, even though it is less probative than evidence of a more similarly situated comparator." *Id.*

While "very close" temporal proximity can be sufficient to establish the causal element of a prima facie case of retaliation, it is insufficient by itself to demonstrate pretext. *See Lyons*, 964 F.3d at 306-07; *see also Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) (holding that "temporal proximity alone is insufficient to prove but for causation" and is just one of the elements to consider in determining pretext). A "combination of suspicious timing with other *significant evidence* of pretext, can be sufficient to survive summary judgment." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999) (emphasis in original); *see also Saketkoo,* 31 F.4th at 1003 (same). Mere speculation and subjective belief of retaliation, however, are not sufficient to withstand summary judgment. *See*

26

*Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005); *Vincent v. Coll. of the Mainland*, 703 F. App'x 233, 240 (5th Cir. 2017).

Construing the competent summary judgment evidence in Plaintiff's favor, a reasonable juror could find temporal proximity since there is some evidence that the investigation into Plaintiff's discrimination complaint was ongoing at the time he was terminated. *See* Ex. [111-19] at 3 (filed restricted access); Ex. [111-23] at 1-2 (filed restricted access); Lively Dep. [108-25] at 28-29. Beyond timing alone, however, Plaintiff has not pointed to any other significant evidence of pretext. *See Shackelford*, 190 F.3d at 409.

In arguing pretext, Plaintiff attempts to discredit the legitimacy of CAF-2. *See* Resp. [108] at 20. However, CAF-2 was issued on or about March 14, 2018, *see* Ex. [111-11] at 1 (filed restricted access), over a month prior to Plaintiff's complaint on April 19, 2018, *see* Ex. [108-21] at 1; Ex. [111-19] at 1 (filed restricted access). Plaintiff also cites Lively's alleged demeanor once he learned of Plaintiff's disability, not what occurred after his internal complaint, which is the relevant inquiry for a retaliation claim. *See* Resp. [108] at 21. Lively's issuance of CAF-2 and his purported change in demeanor upon learning of Plaintiff's disability all predated his protected activity and are thus not evidence of pretext for retaliation. *See, e.g.,* Ex. [111-11] at 1 (filed restricted access); Ex. [108-21] at 1; Ex. [111-19] at 1 (filed restricted access).

With respect to any other evidence of pretext as it relates to CAF-3 and CAF-4, as the Court has previously discussed, Plaintiff has not presented competent

summary judgment evidence that rebuts each of Defendant's stated reasons for his termination, nor has he shown that Defendant's explanation for its employment decision is unworthy of credence. *See Brown*, 969 F.3d at 577. Nor has Plaintiff proffered competent evidence of disparate treatment. *See id.* While Plaintiff makes general allegations concerning the treatment of other general managers, he has not identified a specific comparator or otherwise shown that his termination was taken "under nearly identical circumstances" as those faced by any one or more comparators. *Id.* at 580. Because Plaintiff has not created a genuine dispute of material fact as to pretext, summary judgment is appropriate on his ADA and Title VII retaliation claims.

### III. CONCLUSION

To the extent the Court has not specifically addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result. Defendant's Motion [98] for Summary Judgment should be granted.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Motion [98] for Summary Judgment filed by Defendant Aaron's, Inc. is **GRANTED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiff José Joaquin Santana, Jr.'s remaining claims are **DISMISSED WITH PREJUDICE.** A separate final judgment will be entered pursuant to Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED**, this the 22nd day of June, 2022.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE